BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| IN RE: TEPEZZA MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL No. 3079 |

**DEFENDANT HORIZON THERAPEUTICS USA, INC.'S
RESPONSE IN OPPOSITION TO
PLAINTIFF'S MOTION FOR TRANSFER AND COORDINATION OR
CONSOLIDATION UNDER 28 U.S.C. § 1407**

Defendant Horizon Therapeutics USA Inc. ("Horizon") submits this response in opposition to the Motion for Transfer and Coordination or Consolidation Under 28 U.S.C. § 1407 ("Transfer Motion") filed by Plaintiff Kimberly Exton ("Movant"). The Panel should deny Movant's Transfer Motion because Movant has failed to satisfy her heavy burden of demonstrating that centralization would promote the just and efficient conduct of these proceedings.

**INTRODUCTION**

On January 21, 2020, the U.S. Food and Drug Administration approved TEPEZZA®, a prescription biologic, as a safe and effective treatment for adults with Thyroid Eye Disease, a rare condition where the muscles and fatty tissues behind the eye become inflamed, causing the eyes to be pushed forward and bulge outwards (proptosis). TEPEZZA® is the first and only FDA-approved treatment for Thyroid Eye Disease.

The lawsuits that are the subject of Movant's motion involve allegations that the plaintiffs developed permanent hearing loss and/or tinnitus after receiving TEPEZZA® infusions. TEPEZZA®'s FDA-approved labeling disclosed hearing impairment, including deafness, among the most common adverse reactions, occurring in 10% of patients participating

in clinical trials. Nevertheless, Plaintiffs allege that Horizon did not adequately warn of the risk of hearing loss associated with the use of TEPEZZA® and claim that TEPEZZA® was defectively designed.

Transfer and coordination or consolidation is unwarranted here because Movant has failed to make a particularized showing that centralization—which the Panel has described as the "last solution"—is needed. *In re Covidien Hernia Mesh Prods. Liab. Litig.*, 481 F. Supp. 3d 1348, 1349 (J.P.M.L. 2020).

*First*, formal centralization is inappropriate because the Transfer Motion involves only nineteen claimants[1] (half of whom are represented by the same counsel), and a single defendant represented by one law firm. And unlike many drugs involved in multi-district litigation, the number of patients treated with TEPEZZA® is limited by the fact that it is an Orphan Drug used for treatment of a rare disease and approved by the FDA just over three years ago. Thus, the number of potential plaintiffs is limited.

*Second*, Movant has made no showing of duplicative discovery or inconsistent pretrial rulings necessitating centralization under Section 1407. To the contrary, given the small number of actions and counsel—nineteen claims spread across five jurisdictions—the parties have already been successfully engaging in formal coordination and voluntary cooperation. Currently pending before the Northern District of Illinois is a Motion to Relate and Reassign Cases Under Local Rule 40.4, which implicates fifteen plaintiffs. Horizon opposed the motion to reassign, in part, because no Plaintiff has a viable product liability claim related to TEPEZZA® and because the cases involve substantially different facts and causation issues that directly impact the claims and defenses, rendering Local Rule 40.4 inapplicable. However, Horizon agreed that

---

[1] Movant's Schedule of Actions lists eighteen claims, and one "tag along" claim was filed subsequent to the Transfer Motion.

2

consolidation for the purposes of discovery only would be appropriate under N.D. Ill. IOP 13(e) if the cases proceed past the pending motions to dismiss. (*See* Case No. 22-cv-04518, Dkt. # 34, PageID #: 706).

In the alternative, if the Panel ultimately concludes that centralization is merited, Horizon respectfully submits that the Northern District of Illinois before the Honorable John R. Blakey, is the appropriate transferee venue. The Northern District of Illinois is the location of Horizon's U.S. headquarters and thus the location of many of the witnesses and evidence. It is also the location of the first-filed TEPEZZA® case and where fifteen of the nineteen cases are already pending. Horizon opposes transfer to the Northern District of California because there is no relationship between the parties and that venue, and it is inconvenient for counsel for both sides.

## FACTUAL BACKGROUND

### A. TEPEZZA®'s Development and Regulatory History

In January 2020, FDA approved TEPEZZA® as the first-ever drug for adults with Thyroid Eye Disease. Thyroid Eye Disease is rare, affecting approximately 0.25% of the population.[2] But for patients suffering from moderate-to-severe Thyroid Eye Disease, it can be incapacitating. Before TEPEZZA®'s approval, the only treatment option for severe Thyroid Eye Disease was surgery, which involves removing bone between the eye socket and the sinuses.

The FDA granted Orphan Drug designation to TEPEZZA® on May 6, 2013. Orphan Drugs treat rare diseases or conditions (those affecting fewer than 200,000 people in the U.S.). These are drugs and treatments that historically received little attention from pharmaceutical companies because the comparatively small demand for treatment provides little motive to

---

[2] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4655452 (last accessed 4/14/23). *See also* Transfer Motion at p. 2 ("TED and Graves' disease impact[] roughly 15,000 to 20,000 people each year in the United States.").

undertake research and development. *See* 21 U.S.C. § 360bb. The FDA also granted TEPEZZA® Priority Review, in addition to Fast Track and Breakthrough Therapy Designation—both of which expedite the review process for biologics intended to treat a serious condition and preliminarily demonstrate substantial improvement over available therapy.

**B. TEPEZZA®'s FDA-approved label warned of the risk of hearing impairment, including deafness**.

The FDA ultimately approved TEPEZZA® based on the results of two clinical trials. TEPEZZA®'s label discloses hearing impairment (and, specifically, deafness) as one of the most common adverse reactions observed in patients receiving the treatment. The label reads:

---------------------------------ADVERSE REACTIONS----------------------------------

> Most common adverse reactions (incidence greater than 5%) are muscle spasm, nausea, alopecia, diarrhea, fatigue, hyperglycemia, **hearing impairment**, dry skin, dysgeusia and headache (6.1)[3]

Additionally, the label provides data concerning adverse reactions, including hearing impairment at an incidence of around 10%, documented in the clinical trials:

**Table 1. Adverse Reactions Occurring in 5% or More of Patients Treated with TEPEZZA® and Greater Incidence than Placebo**

| Adverse Reactions | TEPEZZA® N=84 N (%) | Placebo N=86 N (%) |
|---|---|---|
| Muscle spasms | 21 (25%) | 6 (7%) |
| Nausea | 14 (17%) | 8 (9%) |
| Alopecia | 11 (13%) | 7 (8%) |
| Diarrhea | 10 (12%) | 7 (8%) |
| Fatigue a | 10 (12%) | 6 (7%) |
| Hyperglycemia b | 8 (10%) | 1 (1%) |
| **Hearing impairment c** | **8 (10%)** | **0** |
| Dysgeusia | 7 (8%) | 0 |
| Headache | 7 (8%) | 6 (7%) |
| Dry skin | 7 (8%) | 0 |

---

[3] FDA-Approved labeling for TEPEZZA® attached as Exhibit 2, at p. 8. (emphasis added).

> a Fatigue includes asthenia
> b Hyperglycemia includes blood glucose increase
> c **Hearing impairment (includes deafness, eustachian tube dysfunction, hyperacusis, hypoacusis and autophony)**[4]

Moreover, the FDA Dermatologic and Ophthalmic Drugs Advisory Committee (the "FDA Committee") discussed the risk of hearing loss associated with TEPEZZA® and possible monitoring before FDA approved TEPEZZA® or its label.[5] Indeed, FDA Committee members considered whether to include a recommendation for audiologic testing on TEPEZZA®'s label but decided against it. In reaching this conclusion, the FDA Committee determined that it did not have enough information to make audiologic testing recommendations for TEPEZZA®. Members discussed the lack of information on the mechanism of hearing loss from TEPEZZA®, risk factors for hearing loss with TEPEZZA® use (*e.g.,* pre-existing hearing loss or tinnitus), the association of hearing loss with conditions that TEPEZZA® treats, and lack of data on how to identify and address audiologic symptoms (*e.g.,* a timeline for measuring hearing loss and how to address hearing loss symptoms). Ultimately, the FDA Committee decided to "let the individual patient and physician decide what the appropriate plan is for that patient." [6]

Between August 2022 and April 2023, nineteen Plaintiffs filed claims against Horizon asserting warnings and design defect allegations with respect to TEPEZZA®. The Complaints point to case reports and studies, as well as FDA-mandated adverse event reports as evidence that Horizon should have modified the TEPEZZA® label under the "changes being effected" ("CBE") regulation, 21 C.F.R. § 314.70(e)(6)(iii). Additionally, a few Complaints include

---

[4] *See* Exhibit 2, FDA-Approved labeling for TEPEZZA®, at p. 12 (emphasis added).

[5] Meeting of the Dermatologic and Ophthalmic Drugs Advisory Committee, at pp. 1-7; 79-81, 122-23, 248-49, 264-272, 295, 298-300 (December 13, 2019) ("FDA Transcript"), available at https://www.fda.gov/media/135336/download (last accessed 4/14/23), relevant portions attached as Exhibit 3).

[6] *See* Exhibit 3, FDA Transcript at 79-81, 122-23, 248-49, 264-272, 295, 298-300.

Horizon's disclosure for current and prospective investors filed in its 10-K on March 1, 2023, which indicated the following:

> [P]ost-marketing studies and pharmacovigilance reporting data have shown similar rates of hearing impairment as compared to the TEPEZZA pivotal clinical trials, which is reflected in the FDA-approved label, there have been third party reports that have purported to show higher rates of hearing impairment. In addition, a recent analysis of safety data as part of our ongoing pharmacovigilance program indicated a signal of hearing impairment events of greater severity, in limited cases, than those observed in the TEPEZZA pivotal clinical trials. Based on this analysis, we are discussing with the FDA potential updates to the TEPEZZA label to further characterize the range of events reported.[7]

To date, FDA has taken no action with respect to the TEPEZZA® label.

### C. Movant's Scheduled Actions and their Allegations

Plaintiff Kimberly Exton alleges that she was prescribed and received TEPEZZA® infusions from August 2021 through February 2022 and subsequently suffered from permanent hearing loss and tinnitus. Complaint at ¶¶ 10-11. Her Complaint alleges claims for Strict Liability – Failure to Warn, Strict Liability – Design Defect, Negligence, and Punitive Damages. The nineteen pending claims identified in the Schedule of Actions make similar products liability claims against Horizon for alleged design and warnings defects. Fifteen of the nineteen scheduled cases are pending in the Northern District of Illinois; the other four are in federal court in New York, California, Georgia, and Washington. Six law firms represent the plaintiffs in these actions, with the Johnson Becker firm representing nine of the fifteen plaintiffs who filed in the Northern District of Illinois. Frost Brown Todd, LLP in Indianapolis, Indiana and Louisville, Kentucky serves as national counsel for Horizon in these matters, with local counsel admitted to practice in the jurisdictions where the cases are pending.

All nineteen actions are in their early stages. Horizon has filed motions to dismiss in

---

[7] https://ir.horizontherapeutics.com/sec-filings/sec-filing/10-k/0000950170-23-005337 (last accessed 4/14/23).

response to the Complaints in twelve of the cases (and intends to file motions to dismiss in the remaining seven cases) on grounds that the claims are preempted under federal law. Plaintiffs allege that Horizon should have amended the TEPEZZA® label using the CBE regulation, but they fail to identify or allege any "newly acquired information" available during the relevant timeframe (which varies based on each Plaintiff's treatment dates) that Horizon could have used to unilaterally update the label. Likewise, FDA granted approval to TEPEZZA®'s design, and federal law prohibits a manufacturer from redesigning a biologic without FDA approval.[8] Horizon also alleged pleading insufficiencies on state law grounds based on the location of each Plaintiff's treatment and residence.[9]

No court has held a scheduling conference, other than to issue deadlines for briefing on the motions to dismiss. No party has produced or received documents or other materials through discovery, and no depositions have occurred. No court has issued any substantive ruling, let alone inconsistent pre-trial rulings. In December 2022, nine plaintiffs moved to Relate and Reassign all then-pending cases in the Northern District of Illinois pursuant to N.D. Ill. Local Rule 40.4 and Internal Operating Procedure 13(e) (the "Rule 40.4 Motion"). Horizon objected to the Rule 40.4 Motion for the same reasons it opposes the current motion: factual dissimilarities among Plaintiffs and causation issues, unique applicable case law, and lack of judicial savings and net efficiency. (Horizon's Objection and Response to Plaintiffs' Motion to Relate and

---

[8] Indeed, a proposed "redesign" of TEPEZZA® is impossible. TEPEZZA® is a human monoclonal antibody that is not chemically synthesized. Thus, scientifically speaking, Horizon did not design TEPEZZA® the way other manufacturers design a standard prescription drug. To change TEPEZZA®'s design by changing it in any way would be to turn it into an entirely different substance—one which would not have TEPEZZA®'s properties and would likely not even be an effective treatment for thyroid eye disease for which TEPEZZA® has been approved by the FDA.

[9] The Plaintiffs' home states are Alabama, Arizona, California, Georgia, Kentucky, Maryland, North Carolina, New York, Pennsylvania, Virginia, and Washington.

Reassign Cases Under LR 40.4 and IOP 13(e)), attached as Exhibit 1). The Rule 40.4 Motion was fully briefed in January 2023. In early February 2023, Judge Leinenweber, the judge before whom the motion is pending, advised that he would be ruling on the briefs without a hearing. To date, an Order has not yet been entered. All cases in the Northern District of Illinois have been stayed pending a ruling on the Rule 40.4 Motion, except for the *Williams v. Horizon* (N.D. Ill. Case no. 22-cv-06838) and *Fisher v. Horizon* (N.D. Ill. Case no. 23-cv-00805) in which briefing schedules on the Motion to Dismiss have been set. Responsive pleadings have not yet been filed (and are not yet due) in the remaining seven cases.

Plaintiffs' claims raise numerous fact-specific issues that necessarily require individualized inquiries. Federal preemption under the CBE regulation turns on whether and when Horizon obtained "newly acquired information" that would permit it to amend TEPEZZA®'s label. None of the Plaintiffs have demonstrated that Horizon was permitted, much less required, to amend TEPEZZA®'s label during the relevant time frame —before each Plaintiff received TEPEZZA®. Even so, Plaintiffs received infusions at different times. Some received TEPEZZA® just months after it was approved in 2020, whereas others were treated into the later part of 2022. *Compare Walker v. Horizon* (N.D. Ill. Case No. 22-cv-06375) Amended Complaint, Dkt# 23 at ¶ 10 (June 2020–November 2020 treatment dates), *with Lukowski v. Horizon* (N.D. Ill. Case No. 23-cv-01159) Complaint, Dkt# 1 at ¶ 10 (August–October 2022 treatment dates).[10] Plaintiffs' medical histories are also unique, including different pre-existing issues with hearing loss, a condition that is associated with Thyroid Eye Disease. Plaintiffs also received TEPEZZA® for different lengths of time, with different amounts and rates of infusion, and were treated by different physicians at different infusion facilities. As a result, each case presents different causation issues depending on the relative facts.

---

[10] Exhibit 4 is a chart listing each of the plaintiffs' treatment dates with TEPEZZA®.

Different legal standards govern each of the cases based on the location of the alleged injury. Some states apply an "unreasonably dangerous" standard for design defect claims, whereas others require proof of a feasible alternative design. The warning defect requirements also vary by state and depend on what the user and/or the learned intermediary knew about the risks of the product, and when the knowledge was acquired.

## **LEGAL STANDARD**

Under 28 U.S.C. § 1407(a), "[w]hen civil actions involving one or more common questions of fact are pending in different districts," the Panel may transfer those actions "to any district for coordinated or consolidated pretrial proceedings." Although these actions present some common questions of fact, centralization is warranted only if doing so "would serve the convenience of the parties and witnesses or further the just and efficient conduct of this litigation." *In re TD Bank, N.A.*, 703 F.Supp. 2d 1380, 1381 (J.P.M.L. 2010); *see also In re Highway Accident Near Rockville, Conn.*, 388 F.Supp. 574, 575 (J.P.M.L. 1975) ("Before transfer will be ordered, the Panel must be satisfied that all of the statutory criteria have been met.")[11] Significantly, the moving party bears the burden of establishing that formal centralization is warranted under Section 1407(a).

---

[11] "Section 1407 does not, as a general rule, empower the Panel to transfer cases involving only common legal issues." *See In re Teamster Car Hauler Prod. Liab. Litig.*, 856 F.Supp. 2d 1343 (J.P.M.L. 2012) (explaining that the common issue of "complete preemption" was insufficient to justify centralization).

9

# ARGUMENT

**I. Transfer will not promote the just and efficient conduct of these proceedings.**

  A. <u>Movant has failed to show that centralization is necessary for the nineteen pending federal actions</u>.

The Transfer Motion encompasses only nineteen federal actions pending in five districts. As the Panel has long held, where only a small number of actions and districts are involved, the moving party bears a heavier burden to demonstrate the need for centralization. *See In re Transocean Ltd. Sec. Litig. (No. II)*, 753 F.Supp. 2d 1373, 1374 (J.P.M.L. 2010). And although the Panel is "disinclined to take into account the mere possibility of future filings in [the] centralization calculus[,]" the fact remains that a relatively low number of individuals have received TEPEZZA®. *See In re Qualitest Birth Control Prod. Liab. Lit.*, 38 F.Supp. 3d 1388, 1389 (J.P.M.L. 2014). As discussed, TEPEZZA® is an Orphan Drug that, by definition, treats a rare disease affecting an estimated 15,000-20,000 people in the United States. TEPEZZA® has been only available to prescribing physicians and patients for three years. Thus, while Movant would have the Panel believe that ***thousands*** of additional actions will be filed because of Horizon's "aggressive direct-to-consumer marketing campaign" (Transfer Motion, p. 1), the reality is that approximately 12,000 Americans have received TEPEZZA® since its approval in 2020.[12] And only nineteen have filed suit. As such, there exists only a discrete, low number of

---

[12] Movant also notes that Horizon received hundreds of adverse event reports following TEPEZZA®'s approval in 2020, (Transfer Motion, p. 3). Specifically, in the Complaints, Plaintiffs' allege: 45 adverse events in 2020; 106 adverse events in 2021; and 92 in 2022. However, these reports are not predictive of anticipated future filings, nor do they indicate risks different than what Horizon warned about on the TEPEZZA® label. FDA regulations require pharmaceutical companies to submit reports for "[a]ny adverse event associated with the use of a drug in humans, whether or not considered drug related." 21 C.F.R. § 314.80(a). Importantly, the regulation contains a disclaimer that "[a] report or information submitted by an applicant under this section (and any release by FDA of that report or information) does not necessarily reflect a conclusion by the applicant or FDA that the report or information constitutes an admission that the drug caused or contributed to an adverse effect." 21 C.F.R. § 314.80(l).

potential plaintiffs. *See also In re Belviq (Lorcaserin HCl)*, 555 F.Supp. 3d 1369, 1370 (J.P.M.L. 2021) (denying centralization where there were only "at most, twenty actions" pending, despite the plaintiffs' prediction that the litigation would encompass "hundreds or thousands of cases.").

Centralization is unnecessary for the additional reason that there are "limited number of involved counsel" in the litigation. *See In re Cordarone (amiodarone Hydrochloride) Mktg. Sales Prac. & Prod. Liab. Litig.*, 190 F.Supp. 3d 1346, 1348 (J.P.M.L. 2016); *In re Mirena IUS Levonorgestrel-Related Prod. Liab. Litig.*, 38 F.Supp. 3d 1380, 1381 (J.P.M.L. 2014). Horizon—the sole defendant in all nineteen actions—has retained Frost Brown Todd LLP as national counsel. There are six firms representing the plaintiffs, with one firm—Johnson Becker—representing nine Plaintiffs in the Northern District of Illinois.[13]

### B. Informal coordination can be achieved through voluntary cooperation.

The small number of actions and law firms involved allows for informal cooperation, which warrants denial of the Transfer Motion at this time. The Panel has emphasized that where at all possible, informal coordination is "preferable to formal centralization." *In re Adderall XR (Amphetamine/Dextroamphetamine) Mktg., Sales Prac. & Antitrust Litig.*, 968 F.Supp. 2d 1343, 1344-45 (J.P.M.L. 2013). Here, half of the cases involve common plaintiffs' counsel, with whom Horizon's national counsel is already cooperating with informally. Horizon's national

---

Adverse event reports also cannot demonstrate a greater frequency of adverse events because the database may contain duplicate reports where the same report was submitted by a consumer and by the sponsor. "Therefore, FAERS data cannot be used to calculate the incidence of an adverse event … in the U.S. population." Questions and Answers on FDA's Adverse Event Reporting System (FAERS) https://www.fda.gov/drugs/surveillance/questions-and-answers-fdas-adverse-event-reporting-system-faers (last accessed 4/14/23).

[13] The remaining plaintiffs are represented by Simmons Hanly Conroy (*Lucci*, N.D.Ill.; *Perez*, N.D.Ill.; and *Lukowski*, N.D.CA.), Peiffer Wolf Carr (*Diaz*, N.D.Ill.; *Klostermann*, N.D.Ill.; *Pledger*, N.D.Ill.; and *Kanester-Rychner*, W.D.WA), Dicello Levitt (*Snyder*, N.D.Ill.), Childers Schlueter & Smith (*Simpson*, M.D. Ga.), and Levin Papantonio (*Exton*, N.D.N.Y.).

counsel will continue to cooperate and efficiently coordinate discovery (if needed) and other pretrial matters as appropriate. *See In re OxyElite Pro & Jack3d Prod. Liab. Litig. (No. II)*, 65 F.Supp. 3d 1412, 1413-14 (J.P.M.L. 2014) ("Informal cooperation among the involved attorneys and coordination between the involved courts . . . remains practicable and preferable to formal centralization of this litigation.").

Given the low number of claimants and counsel, Movant fails to demonstrate why formal centralization is necessary in this instance. Instead, Movant relies on conclusory assertions and rote generalizations, such as a "risk" of inconsistent rulings and "serial litigation." (Transfer Motion pp. 7-8). Rather than highlight real disputes regarding informal coordination (which do not exist),[14] Movant offers only perfunctory statements that apply to every would-be MDL, like the threat of duplicative discovery,[15] the danger of inconsistent rulings, and the interests of judicial economy. (*Id.* at pp. 11-12). On this record, Movant has not shown that centralization of these cases would "promote the just and efficient conduct of [these] actions." 28 U.S.C. § 1407.

At a minimum, Movant's request for centralization is premature and contrary to the Panel's guidance that the parties should first seek alternatives to centralization before asking the Panel to intervene. *See In re Best Buy Co. Inc., Cal. Song-Beverly Credit Cart Act Litig.*, 804 F.Supp. 2d 1376, 1379 (J.P.M.L. 2011). As the Panel has recognized, centralization of products liability actions has the unintended consequence of attracting more new case filings. Indeed,

---

[14] As discussed, Horizon opposed formal reassignment but agreed to work with the Court and counsel to coordinate discovery proceedings in response to Plaintiffs' Rule 40.4 Motion.

[15] While Horizon believes that Plaintiffs' claims should not proceed to discovery, there are many mechanisms available to the parties to minimize the possibility of duplicative discovery short of Section 1407 transfer. *In re Eli Lily & Co., (Cephalexin Monohydrate) Patent Litig.*, 446 F.Supp. 242, 244 (J.P.M.L. 1978). "[N]otices of deposition can be filed in all related actions; the parties can stipulate that any discovery relevant to more than one action can be used in all those actions; or the involved courts may direct the parties to coordinate their pretrial activities." *In re Adderall*, 968 F.Supp. 3d at 1345.

MDLs often attract cases based not on their merits, but instead because they can be easily filed, escape individual scrutiny, and inflate case counts in an effort to inflict settlement pressure. *In re Mentor Corp. Obtape Transobturator Sling Prod. Liab. Litig.* 2016 WL 4705827, at *2 (M.D. Ga. Sept 7, 2016); *see also In re Uponor, Inc., F1960 Plumbing Fittings Prod. Liab. Litg.*, 895 F.Supp. 2d 1346, 1348 (J.P.M.L. 2012) (noting the risks of "added inconvenience, confusion and cost" with premature centralization). Informal alternatives to centralization are possible and preferable in these cases. The Panel need not order formal centralization and impose "the last solution" for a problem that Movant has not tried to solve or even shown to exist.

In sum, Plaintiff has failed to carry her burden to show that a transfer would "promote the just and efficient conduct of [these] actions," and seeks to impose the "last solution"—coordination—instead of informal cooperation, which is possible and preferable here. The Transfer Motion should be denied.

## II. If the Panel determines that centralization is warranted, then the Northern District of Illinois, with the Honorable John R. Blakey presiding, would be the most appropriate transferee court.

For the reasons stated above, Horizon does not believe centralization under Section 1407 is merited. However, if there is to be an MDL, the Northern District of Illinois with Judge Blakey presiding over the litigation is the most appropriate transferee forum.

In determining the most appropriate transferee forum under Section 1407, the Panel considers (among other things), the location of the parties, witnesses, and documents; the convenience of the parties and witnesses; the progress achieved in the pending actions; the resources and experience of the transferee forum; and the preference of the parties. *See In re Mirena IUS Levonorgestrel-Related Prod. Liab. Litig. (No. II)*, 249 F.Supp. 3d 1357, 1360 (J.P.M.L. 2017) (ordering transfer and considering parties' convenience); *In re Sprint Premium*

13

*Data Plan Mktg. & Sales Prac. Litig.*, 777 F.Supp. 2d 1349, 1351 (J.P.M.L. 2011) (a district is an "appropriate transferee district" if it "has a great deal of experience serving as a transferee court yet has a manageable MDL docket"). All of these factors weigh in favor of selecting the Northern District of Illinois as the transferee forum.

The Northern District of Illinois is the location of the first-filed action, *Weibel v. Horizon* (N.D.Ill. Case no. 22-cv-04518), and the location of the majority of the currently pending actions. The Northern District of Illinois has a meaningful nexus to the parties, witnesses, and documents. Horizon's U.S. headquarters are just outside of Chicago in Deerfield—and thus many of the witnesses and relevant documents are located in the Northern District of Illinois. *See In re Profemur Hip Implant Prod. Liab. Litig.*, 481 F.Supp. 3d 1350, 1353 (J.P.M.L. 2020) (centralizing related actions in the district court "located near the Wright and Microport defendants' Memphis headquarters, where relevant documents and witnesses may be found"); *In re Farxiga (Dapagliflozin) Prod. Liab. Litig.*, 273 F.Supp. 3d 1380, 1382 (J.P.M.L. 2017) (centralizing related actions in the S.D.N.Y. because the defendant "is headquartered in New York, and thus many witnesses and relevant documents are likely to be found in or near the district"); *In re Procter & Gamble Aerosol Prod., Mktg. & Sales Litig.*, 600 F.Supp. 3d 1343, 1344 (J.P.M.L. 2022) (centralizing related actions where "P&G has its headquarters" because "common witnesses and other evidence likely will be located in or near this district"). The Northern District of Illinois is also the only forum that has jurisdiction over all of the related actions. Because Horizon's principal place of business is in Illinois, it is subject to general personal jurisdiction in the Northern District of Illinois. Additionally, Chicago is geographically accessible and convenient for parties, witnesses, and counsel. Counsel for both sides are located in or near the Midwest United States, and there are many direct flights to Chicago's two airports

from counsel's homebase locations. Finally, the Northern District of Illinois has the resources and expertise to manage coordinated litigation. The district has extensive experience handling MDLs, including several product liability MDLs involving drugs and medical devices. *E.g., In re Zimmer NexGen Knee Implant Prods. Liab. Litig.*, MDL No 2272; *In re Testosterone Replacement Therapy Prods. Liab. Litig.,* MDL No. 2545).

Judge Blakey's distinguished and wide-ranging legal career followed by nearly a decade on the federal bench presiding over complex and substantial litigation, makes him an ideal candidate to preside over these cases. He is already handling two of the fifteen cases pending in the Northern District of Illinois and is thus familiar with the litigation. (*See Lucci v. Horizon,* N.D.Ill. Case no. 22-cv-07351 and *Pledger v. Horizon,* N.D.Ill. Case no. 22-cv-06562). Judge Blakey is also an experienced transferee judge, who is efficiently and effectively presiding over MDL 3009 *In re Seresto Flea and Tick Collar Marketing, Sales Practices and Products Liability Litigation*, in which the parties are actively participating in settlement negotiations before Magistrate Judge Heather K. McShain. He has authored numerous opinions on product liability claims, including design and warnings defects issues, and he will therefore be well-versed with the legal issues involved in these cases. Finally, Judge Blakey has the experience and disposition to deftly manage this litigation.

In contrast, the Northern District of California is already overtaxed and has no nexus to the parties. It is currently the home of 17 active MDLs, the most of any district in the United States, despite the fact that there are two current judicial vacancies in the district deemed judicial emergencies.[16] Further, three plaintiffs allege that they are California residents, but two of those plaintiffs—*Perez* and *Diaz*—chose to file in the Northern District of Illinois. And, as already

---

[16] https://www.uscourts.gov/judges-judgeships/judicial-vacancies/judicial-emergencies (last accessed 4/14/23).

15

noted, the majority of counsel for both sides are located in the Midwest region: counsel for Horizon are located in Indiana and Kentucky; Johnson Becker, which represents half of the plaintiffs, is located in Minnesota; Simmons Hanly Conroy is located in Illinois; Peiffer Wolf Carr is in Ohio; and Dicello Levitt is also in Ohio. The two remaining plaintiffs' firms are also both much closer to Chicago than California with Childers Schlueter & Smith in Georgia and Levin Papantonio in Florida. The factors of location of the parties, witnesses, and documents, the convenience of the parties and witnesses, and available judicial resources all weigh against the Northern District of California.

## CONCLUSION

Horizon respectfully requests that the Panel deny the Transfer Motion. In the alternative, if the Panel believes that centralization is warranted now, Horizon requests that the Panel select the Northern District of Illinois for coordinated pretrial proceedings before the Honorable John R. Blakey.

Respectfully submitted,

*/s/ Eric A. Riegner*
Eric A. Riegner
FROST BROWN TODD LLP
111 Monument Circle, Suite 4500
Indianapolis, IN 46244
eriegner@fbtlaw.com

*Counsel for Horizon Therapeutics USA, Inc.*

0133648.0761386   4883-8796-4251v5